UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____
                                    :
CHARLES W. GOULD,                   :
                                    :
        Petitioner,                 :    Civ. No. 18-9406 (NLH)
                                    :
    v.                              :    OPINION
                                    :
WILLIE BONDS, et al.,               :
                                    :
        Respondents.                :
_____:

APPEARANCES:
Charles W. Gould, No. 693505/C-398136
South Woods State Prison
215 South Burlington Road
Bridgeton, NJ 08302
     Petitioner <u>pro</u> <u>se</u>

Patrick Daniel Isbill
Camden County Prosecutor's Office
25 North Fifth Street
Camden, NJ 08102
     Counsel for Respondents

<u>HILLMAN, District Judge</u>

     Petitioner Charles Gould ("Petitioner"), a prisoner

presently incarcerated at South Woods State Prison in Bridgeton,

New Jersey, has filed a Petition for a Writ of Habeas Corpus

pursuant to 28 U.S.C. § 2254 (the "Petition").  (ECF No. 1.)

Respondents Willie Bonds and the Attorney General for the State

of New Jersey ("Respondents") filed an Answer to the Petition

(the "Answer").  (ECF No. 9.)  For the following reasons, the

Court will deny the Petition and a certificate of appealability

will not issue.

## I.  BACKGROUND

In its opinion on direct appeal, the Superior Court of New Jersey, Appellate Division, provided the following summary of the factual background of Petitioner's case:

> Around 4:00 p.m. on March 30, 2010, Brandon Adams was standing at the corner of Rand and Thorndyke in Camden selling drugs with Kelly Robinson who was acting as a look-out. Alcedes Santori walked past the two men and greeted Adams. Santori continued toward a friend's house nearby. While in the house, Santori noticed Victoria Long outside and went down to smoke a cigarette with her. Long only had one cigarette so she walked toward Adams to see if he had any. Long returned with a cigarette and then walked with Santori back towards Adams.
>
> As Santori and Long approached Adams, they noticed two men. One stayed at the corner while the other, armed with a handgun, approached Adams. The gunman, later identified as defendant, put the gun to Adams's stomach and demanded his money. Adams appeared to recognize the gunman and, at first, thought he was joking. Once he realized the gunman was serious, Adams turned over his money.
>
> Defendant then ordered Adams to take him to where his "stash" of drugs was hidden. Adams directed defendant to an alleyway where he had kept some of his drugs, but explained that there were no drugs there. Defendant became irate and shot Adams five times, causing severe injuries to his arm, stomach and liver. Defendant then left with the other person.
>
> After the shooting, Santori and Long fled back to their friend's house. Adams followed them and asked them to call an ambulance. When the ambulance did not arrive promptly,

Long and her brother, Michael Leslie, drove Adams to Cooper University Hospital. Adams underwent several surgeries to repair injuries from gunshot wounds to his abdomen and liver, and two fractured bones in his right arm.

New Jersey State Trooper Arthur Barilotti led the investigation into Adams's shooting. Barilotti conducted a tape-recorded interview of Robinson who provided a description of the gunman. Robinson said he had seen the gunman before.

The following day, Barilotti went back to the hospital to question Adams. While Adams provided a description of the gunman, he would not cooperate further with the investigation. Barilotti learned from Michael Leslie, Long's brother, that the "the word on the street" was that the shooter's nickname was "Mister."

On April 1, 2010, Adams's mother, Jean Adams, contacted the Camden Police Department and informed them that her son told her that a man named "Mister" had shot him, but he did not want her to tell the police because he did not want to be known as a "snitch." After speaking with Ms. Adams, Detective Barilotti returned to the hospital with her. Ms. Adams went into her son's room first, while Barilotti waited outside the room. Barilotti heard Adams yelling at his mother for talking to the police and told her that he could be in danger now. After hearing this, Barilotti entered the hospital room to try and speak with Adams but he became angry and refused to provide any information.

After learning that defendant was known as "Mister," Barilotti prepared a photo array for the three eyewitnesses to the shooting, Long, Santori and Robinson. Santori picked up defendant's photo, hesitated, but did not identify any of the photos as the shooter.

While the police were transporting Santori home, he began to cry and expressed concern for his family's safety. Trooper Michael Legati asked him if he saw the shooter in the photo array and he responded that it was number four, "Mister." The police, however, were not able to obtain a formal statement from Santori.

Long was shown the same photo array and identified defendant, whom she knew as "Mister." She told police that the way "Mister" shot Adams was not right and that it seemed "personal."

Robinson viewed the photo array and also identified defendant as the shooter. He said he was "positive it's him," and that he was "a hundred percent" positive. Robinson then explained that "Mister" threatened him the night of the shooting and said what happened to Adams could happen to him.

At trial, Long, Santori and Robinson all denied identifying defendant as the shooter in the photo arrays. The State conducted a *Gross* hearing to determine if the witnesses' prior inconsistent statements identifying defendant could be admitted. The trial court found these pre-trial identifications to be reliable and permitted their admission.

During the trial, Adams was called as a witness for defendant and testified that he was able to see who shot him and Adams was not the shooter. On cross-examination, the State asked Adams whether he told his mother that "Mister" was the person who shot him. When he denied this, the trial court permitted the State to call Ms. Adams as a rebuttal witness. Ms. Adams testified that while Adams was in the hospital he told her that "someone named 'Mister' shot him." She indicated that Adams described "Mister" as a light-skinned male who wore glasses.

> Defendant told her not to tell anyone about
> this.
>
> Defendant did not testify on his behalf.

State v. Gould, A-2756-11T3, 2013 WL 5300618, at *1–3 (N.J. Super. App. Div. 2013) (internal footnotes omitted).

Petitioner was sentenced to an aggregate term of twenty-five years imprisonment. (ECF No. 9-3.) The Appellate Division affirmed Petitioner's conviction and sentence. See id. at *7. On April 4, 2014, the New Jersey Supreme Court denied Petitioner's application for a writ of certiorari. See State v. Gould, 88 A.3d 936 (N.J. 2014).

Thereafter, Petitioner filed a petition for post-conviction relief ("PCR"). (ECF No. 9-13.) Following oral argument, the PCR court denied Petitioner's application. (ECF No. 9-35 at 2.) The Appellate Division affirmed the PCR court's denial but remanded the matter for a correction of the judgment of conviction to reflect the accurate period of parole ineligibility. See State v. Gould, A-5052-14T1, 2017 WL 4079023, at *5 (N.J. Super. Ct. App. Div. Sept. 15, 2017). The New Jersey Supreme Court denied Petitioner's request for a writ of certiorari. See State v. Gould, 180 A.3d 697 (N.J. 2018).

In May 2018, Petitioner filed the instant habeas petition, pro se. (ECF No. 1 at 16.) Petitioner raises claims of prosecutorial misconduct, trial court error, and ineffective

assistance of appellate counsel.  (See generally ECF No. 1-4.)
On August 28, 2018, Respondents filed an answer opposing
Petitioner's § 2254 application.  (ECF No. 9.)

## II.  STANDARD OF REVIEW

A petition for writ of habeas corpus pursuant to 28 U.S.C.
§ 2254 is the proper mechanism for a state prisoner to challenge
the fact or duration of his confinement where the petitioner
claims his custody is in violation of the Constitution or the
laws of the United States.  See 28 U.S.C. § 2254(a); Cullen v.
Pinholster, 563 U.S. 170, 181 (2011); Preiser v. Rodriquez, 411
U.S. 475, 498-99 (1973).  A habeas petitioner bears the burden
of establishing his entitlement to relief for each claim
presented in the petition. See Harrington v. Richter, 562 U.S.
86, 98 (2011).

The standard used in reviewing habeas claims under § 2254
depends on whether those claims have been adjudicated on the
merits by the state court.  If they have not been adjudicated on
the merits, the Court reviews de novo both legal questions and
mixed factual and legal questions.  See Appel v. Horn, 250 F.3d
203, 210 (3d Cir. 2001).  If the state court adjudicated the
claim on the merits, then 2254(d) limits the review of the state
court's decision as follows:

> An application for a writ of habeas corpus
> on behalf of a person in custody pursuant to
> the judgment of a State court shall not be

granted with respect to any claim that was
adjudicated on the merits in State court
proceedings unless the adjudication of the
claim –

> (1) resulted in a decision that was
> contrary to, or involved an
> unreasonable application of, clearly
> established Federal law, as determined
> by the Supreme Court of the United
> States; or

> (2) resulted in a decision that was based
> on an unreasonable determination of the
> facts in light of the evidence
> presented in the State court proceeding
> . . . .

28 U.S.C. § 2254(d).

If a claim has been adjudicated on the merits in state

court,[1] this Court has "no authority to issue the writ of habeas

corpus unless the [state court's] decision 'was contrary to, or

involved an unreasonable application of, clearly established

Federal Law, as determined by the Supreme Court of the United

---

[1] "[A] claim has been adjudicated on the merits in State
court proceedings when a state court has made a decision that
finally resolves the claim based on its substance, not on a
procedural, or other, ground." Lewis v. Horn, 581 F.3d 92, 100
(3d Cir. 2009) (quoting Thomas v. Horn, 570 F.3d 105, 117 (3d
Cir. 2009)). "Section 2254(d) applies even where there has been
a summary denial." Pinholster, 563 U.S. at 187. "In these
circumstances, [petitioner] can satisfy the 'unreasonable
application' prong of § 2254(d)(1) only by showing that 'there
was no reasonable basis' for the [state court's] decision." Id.
(quoting Harrington v. Richter, 562 U.S. 86, 98 (2011); see also
Johnson v. Williams, 568 U.S. 289, 301 (2013) ("When a state
court rejects a federal claim without expressly addressing that
claim, a federal habeas court must presume that the federal
claim was adjudicated on the merits – but that presumption can
in some limited circumstances be rebutted.").

States,' or 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'"  <u>Parker v. Matthews</u>, 567 U.S. 37, 40 (2012) (quoting 28 U.S.C. § 2254(d)).

A court begins the analysis under § 2254(d)(1) by determining the relevant law clearly established by the Supreme Court.  <u>See</u> <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 660 (2004). Clearly established law "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision."  <u>Williams v. Taylor</u>, 529 U.S. 362, 412 (2000).  A court must look for "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision."  <u>Lockyer v. Andrade</u>, 538 U.S. 63, 71-72 (2003).  "[C]ircuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court,' [and] therefore cannot form the basis for habeas relief under AEDPA."  <u>Parker</u>, 567 U.S. at 48-49 (quoting 28 U.S.C. § 2254(d)(1)).

A decision is "contrary to" a Supreme Court holding within 28 U.S.C. § 2254(d)(1), if the state court applies a rule that "contradicts the governing law set forth in [the Supreme Court's] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a [different result.]"

*Williams*, 529 U.S. at 405-06.  Under the "'unreasonable application' clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Williams*, 529 U.S. at 413.  "[A]n unreasonable application of federal law," however, "is different from an incorrect application of federal law."  *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Williams*, 529 U.S. at 410).

### III. DISCUSSION

#### A. Prosecutor's Misuse of Testimonial Hearsay

In his first ground for relief, Petitioner submits that the prosecutor's introduction of hearsay testimony from non-testifying witnesses violated his rights under the Confrontation Clause.  (ECF No. 1-4, at 5-7.)  Specifically, Petitioner contends that Detective Barilotti improperly testified about out-of-court statements obtained from individuals who did not testify at trial.  (Id.)

Throughout trial, defense counsel attacked Detective Barilotti's investigation as having focused on Petitioner, also known as "Mister", based solely upon speculation and "the word on the street."  (ECF No. 9-28, at 15; ECF No. 9-32, at 21.)  On cross-examination of Detective Barilotti, the defense attempted

9

to emphasize this point by eliciting testimony from Detective
Barilotti that two individuals who were not called as witnesses
at trial had identified Petitioner as the shooter based solely
upon "the word on the street." (ECF No. 9-31, at 11.)

> Defense Counsel: Detective, isn't [it] true
> that before the photo array was prepared you
> had actually only heard the name "Mister"
> from two people?
>
> Detective Barilotti: That's correct.
>
> Defense Counsel: And neither one of those
> people were witnesses to the shooting?
>
> Detective Barilotti: That's correct.
>
> Defense Counsel: Isn't it also true that one
> of these two witnesses was Mr. Michael
> Leslie?
>
> Detective Barilotti: Yes—That gave a
> statement, yes.
>
> Defense Counsel: When he gave a statement he
> prefaced it with "the word on the street
> was"?
>
> Detective Barilotti: Yes.
>
> Defense Counsel: So, isn't it also true that
> the other witness who came up with the name
> "Mister" was Brandon Adam['s] mother?
>
> Detective Barilotti: Yes.
>
> Defense Counsel: And she didn't even know
> who "Mister" was?
>
> Detective Barilotti: No, she didn't.
>
> Defense Counsel: So, that was just a name
> that was out there initially as part of the
> investigation, correct?

> Detective Barilotti: Not for Jean Adams, no. I don't know if I could say who -- who Jean Adams was told by.
>
> Defense Counsel: The fact of the matter is she didn't know who -- Jean Adams didn't know who "Mister" was?
>
> Detective Barilotti: No, She didn't know who he was.
>
> Defense Counsel: But, it was a nickname you were familiar with. Is that correct?
>
> Detective Barilotti: Up until -- Yeah, when I first received the name from Michael Leslie.
>
> Defense Counsel: Who had -- Who was not a witness?
>
> Detective Barilotti: Who was not a witness.

(Id. at 11-12.)

To rebut this testimony on redirect examination, the prosecutor elicited testimony from Detective Barilotti that demonstrated the investigation into Petitioner had not been predicated solely upon "the word on the street." (Id. at 27-52.) Detective Barilotti testified that Michael Leslie had driven Brandon Adams to the hospital after he was shot and that Brandon Adam's mother, Jean, had contacted police informing them her son had told her "Mister" shot him. (Id. at 32-34, 39.) Detective Barilotti also detailed the other evidence which led to the investigation of Petitioner as the shooter. (Id. at 46-47.)

On direct appeal, the Appellate Division denied Petitioner's claim that Detective Barilotti's testimony violated Petitioner's due process rights.  See Gould, 2013 WL 5300618, at *3-5.  The Appellate Division found that the trial court "correctly permitted the State to elicit otherwise inadmissible hearsay in order to refute defendant's claim that Detective Barilotti arbitrarily focused his investigation on defendant" since defense counsel had "opened the door into that line of questioning."  Id. at *5.  The Appellate Division added that the evidence had also not been offered for the truth of the matter asserted, but rather to counter defense counsel's attack on the investigation.  See id.

The Confrontation Clause under the Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI; see also Crawford v. Washington, 541 U.S. 36, 42 (2004).  Subject to certain well-delineated exceptions, this clause bars the admission of testimonial statements from witness who did not appear at trial, otherwise known as hearsay. See id. at 53-54.  The Confrontation Clause, however, "does not bar the use of testimonial statements for purposes other than the truth of the matter asserted."  Williams v. Illinois, 567 U.S. 50, 70 (2012) (internal quotation marks omitted).

Here, Petitioner does not point to, and this Court is

unaware of, any Supreme Court case law holding that a
Confrontation Clause violation occurs where a defendant opens
the door to hearsay evidence. See Caines v. Ricci, Civ. No. 10-
3643, 2012 WL 4743128, at *7 (D.N.J. Oct. 2, 2012) ("Respondents
correctly contend that before and after *Crawford*, federal courts
found no Confrontation Clause violation where the defendant
'opened the door' to hearsay evidence."). Several federal
circuit courts of appeal to address the issue have held that
defense counsel can indeed "open the door" to otherwise
inadmissible hearsay. See United States v. Quinones-Chavez, 641
F. App'x 722, 725 (9th Cir. 2016) (holding testimony did not
violate the Confrontation Clause of non-testifying witness where
defense counsel "opened the door by eliciting testimony
concerning those witnesses"); United States v. Ceballos, 789
F.3d 607, 617 (5th Cir. 2015); United States v. Lopez-Medina,
596 F.3d 716, 733 (10th Cir. 2010) ("We . . . believe a
defendant can open the door to the admission of evidence
otherwise barred by the Confrontation Clause."); see also United
States v. Holmes, 620 F.3d 836, 842-43 (8th Cir. 2010)
("*Crawford* did not change the rule that a defendant can waive
his right to confront witnesses by opening the door to the
admission of evidence otherwise barred by the Confrontation
Clause" (internal citation and quotation marks omitted)); see
United States v. Chance, 306 F.3d 356, 385 (6th Cir. 2002)

("[W]here one party has 'opened the door' on an issue, the opponent, in the trial court's discretion, may introduce evidence on the same issue to rebut any false impression that may have been created by the earlier admission of evidence.").

In the instant case, defense counsel intentionally elicited testimony from Detective Barilotti about information provided by Michael Leslie and Jean Adams in order to attack the investigation into the case. This action, as the trial court and Appellate Division ruled, opened the door for the State to reference these witnesses and to rebut the attack on the investigation. Additionally, as both state courts found, the State did not use the evidence for the truth of the matter asserted, but rather to refute the challenge to the integrity of Detective Barilotti's investigation. Given the foregoing, this Court does not find that the state court's adjudication of this issue was contrary to, or an unreasonable application of, clearly established federal law. Petitioner is not entitled to relief on this claim.

### B. Wade Hearing

In his second ground for relief, Petitioner alleges the trial court violated his due process rights by failing to conduct a Wade[2] hearing prior to trial. (ECF No. 1-4, at 7-9.)

---

[2] United States v. Wade, 388 U.S. 218, 242 (1967). Pursuant to Wade, a hearing may be conducted outside the presence of the

Petitioner contends that if a _Wade_ hearing had been conducted, "most of, if not all of the eyewitness statements would have been deemed inadmissible." (_Id._ at 7.) Petitioner suggests that each of the eyewitness identifications of him from a photo array were impermissibly suggestive and the identification process was so tainted that it resulted in an unreliable identification. (_Id._ at 8.)

Petitioner raised this claim on direct appeal. _See Gould_, 2013 WL 5300618, at *1. The Appellate Division found that _Wade_ hearings are conducted based upon a motion made by the defense, but neither Petitioner nor defense counsel ever requested a _Wade_ hearing. _See id._ at *6. The Appellate Division added that even if Petitioner had requested a hearing, however, the record still did not support a finding that the photo array identifications that were administered unfairly or were impermissibly suggestive. _See id._ at *6-7.

In the instant § 2254 application, Petitioner does not cite to any clearly established federal law which requires that a trial court must _sua sponte_ challenge an out-of-court identification or conduct a _Wade_ hearing in the absence of such a challenge or request by a defendant at trial. Further, this

---

jury to determine whether identification testimony should be suppressed because the identification was obtained via unduly suggestive means. _Id._ at 242.

Court's review of relevant Supreme Court precedent suggests that a state trial court has no such obligation. In Watkins v. Sowders, 449 U.S. 341, 349 (1981), the Supreme Court stated that "under our adversary system of justice, cross-examination has always been considered a most effective way to ascertain truth." Relying on the "time-honored process of cross-examination as the device best suited to determine the trustworthiness of testimonial evidence[,]" the Supreme Court explicitly rejected the notion that a state criminal court is compelled to conduct a hearing in every instance where the propriety of identification procedures has been questioned by a defendant. Id.

In light of the Supreme Court's holding in Watkins, this Court cannot conclude the state trial court in this case was compelled to sua sponte conduct a hearing where no challenge to the propriety of the identification procedure had been made. Moreover, Petitioner in this case had the opportunity to challenge the trustworthiness of each eyewitnesses' testimony via the "time-honored process of cross-examination." Id. Accordingly, Petitioner has not demonstrated that he suffered a due process violation, or that the state courts' adjudication of this clearly was contrary to, or an unreasonable application of, clearly established federal law. Petitioner is not entitled to relief on this claim.

## C. Ineffective Assistance of Counsel

In Petitioner's third ground for relief, he raises four claims of ineffective assistance of appellate counsel. The Sixth Amendment of the United States Constitution provides: "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. The Supreme Court has recognized that "the right to counsel is the right to the effective assistance of counsel." Strickland v. Washington, 466 U.S. 668, 686 (1984) (quoting McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970)). A showing of ineffective assistance of counsel requires two components to succeed. Id. at 687. The two requisite proofs are as follows: (1) a defendant must show that counsel's performance was deficient; and (2) the defendant must show prejudice. Id.

When a convicted defendant complains of deficient performance, the defendant's burden of proof is to show that the conduct of counsel fell below an objective standard of reasonableness. Id. at 688. Hence, "[j]udicial scrutiny of counsel's performance must be highly deferential." Id. at 689. To combat the natural tendency for a reviewing court to speculate whether a different strategy at trial may have been more effective, the Supreme Court has "adopted the rule of contemporary assessment of counsel's conduct." Maryland v. Kulbicki, 136 S. Ct. 2, 4 (2015) (quoting Lockhart v. Fretwell,

506 U.S. 364, 372 (1993)). As to proving prejudice under Strickland, "actual ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice." 466 U.S. at 693. To succeed on this proof, a defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Hinton v. Alabama, 134 S. Ct. 1081, 1088 (2014) (quoting Padilla v. Kentucky, 559 U.S. 356, 366 (2010)). A reasonable probability is a probability which sufficiently undermines confidence in the outcome of the trial. Strickland, 466 U.S. at 694.

Generally, appellate counsel has no obligation to raise every claim on direct appeal. See Smith v. Robbins, 528 U.S. 259, 288 (2000); United States v. Sanders, 165 F.3d 248, 253 (3d Cir. 1999). The decision of which issues to raise on appeal is a strategic choice. See Smith, 528 U.S. at 288 (citing Jones v. Barnes, 463 U.S. 745 (1983)). The chief component of effective appellate advocacy is the winnowing out of weaker claims in favor of those with a greater chance of success. See Jones, 463 U.S. at 753. "Declining to raise a claim on appeal, therefore, is not deficient performance unless that claim was plainly stronger than those actually presented to the appellate court." Davila v. Davis, 137 S. Ct. 2058, 2067 (2017).

i. *Flawed Jury Instruction*

Petitioner asserts his appellate counsel should have argued that the trial court improperly vouched for the credibility of witness Victoria Long. (ECF No. 1-4, at 9.) Specifically, Petitioner argues the trial court's instruction to the jury regarding witness identifications improperly indicated that Long had identified Petitioner as the person who committed the offense, despite Long's trial testimony that Petitioner was not the shooter. (Id.; ECF No. 9-3, at 6-8, 13.)

At trial, Long testified in front of the jury that she was unable to remember ever providing a statement to police, ever being shown a photo array of suspects, or ever speaking to law enforcement at all. (ECF No. 9-29, at 11.) This testimony contradicted previous information Long had provided to police. (Id. at 25-26.) After Long's testimony, and upon the State's request, the trial court conducted a hearing to determine the admissibility of Long's previous statements to police where she identified Petitioner as the shooter. (Id. at 26; ECF No. 9-30, at 116-120.) The trial court permitted the State to introduce Long's previous statement to police identifying of Petitioner from a photo array. (ECF No. 9-30, at 99-104.)

During the final jury charge, the trial court instructed the jury, in pertinent part:

Now the state has presented testimony that
on a prior occasion or occasions before this
trial, certain witnesses identified Mr.
Gould as the person who committed the
offenses charged in the indictment. Those
individuals include Kelley Robinson, Alcedes
Santori and Victoria Long.

Now according to the witnesses their
identification of the defendant, Mr. Gould,
was based upon observations and perceptions
that they made of the perpetrator in
proximity to the time the offense or
offenses were being committed.

It is your function to determine whether the
identifications of the defendant, Charles
Gould, are reliable and believable or
whether they are based on a mistake or for
any reason are not worthy of belief. You
must decide whether it is sufficiently
reliable evidence upon which to conclude
that this defendant, Charles Gould, is the
person who committed the offenses charged in
the indictment.

(ECF No. 9-32, at 69-70.)

Immediately following this charge, the trial court also

instructed the jury about prior inconsistent statements made by

witnesses. (Id. at 74.) This charge included, in relevant

part:

Now evidence has been presented showing that
at a prior time witnesses had said something
or failed to say something which is
inconsistent with the witness' testimony at
trial. Again, I refer to the witnesses
Kelly Robinson, Alcedes Santori, and
Victoria Long in this regard.

Now this evidence may be considered by you
as substantive evidence or proof of the
truth of the prior contradictory statements

or omitted statements.  However, before
deciding whether the prior inconsistence
statement or omitted statement reflects the
truth in all fairness you will want to
consider all the circumstances under which
the statement or failure to disclose
occurred.

You may consider the extent of the
inconsistency or omission and the importance
or lack of importance of the inconsistency
or omission on the overall testimony of the
witness bearing on the witness' credibility.

[. . .]

And remember Victoria Long saying that she
didn't even recall making any statements to
the police.

So, those are some of the explanations that
were given by the witnesses.  The extent to
which such inconsistencies or omissions
reflect the truth is for you, the jury, to
determine.  Consider their materiality in
relation to the witness' entire testimony
and all of the evidence in this case: when,
where and the circumstances under which they
were said or omitted and the reasons the
witnesses gave you therefor [sic] appear to
be probable and logical.

(Id. at 74-76.)

Petitioner first argued during his PCR proceedings that

appellate counsel had been ineffective for not arguing that the

trial court's instructions "improperly vouched" for Long's

credibility because they implied Long had identified Petitioner

as the shooter.  (ECF No. 9-13, at 13.)  The PCR court denied

this claim finding the trial court's instructions were "entirely

appropriate and lawful," and holding that "[t]he witnesses

recantation of their prior identification could be used for credibility purposes, but did not take away the impact of their prior observations and perceptions that they made of the perpetrator in proximity to the time of the offense." (ECF No. 9-35, at 12.) The Appellate Division summarily affirmed the PCR court's ruling, stating that further comment beyond the trial court's holding was unnecessary. See Gould, 2017 WL 4079023, at *4-5.

For an incorrect jury instruction to warrant habeas relief, the instruction must have "by itself so infected the entire trial [such] that the resulting conviction violates due process." Duncan v. Morton, 256 F.3d 189, 203 (3d Cir. 2001) (quoting Henderson v. Kibbe, 431 U.S. 145, 154 (1977)). It is not enough that the instruction is merely "undesirable, erroneous, or even universally condemned." Id. To determine the effect of an allegedly erroneous jury instruction on the validity of a petitioner's conviction, courts cannot judge the instruction "in artificial isolation," but must consider it "in the context of the overall charge." Cupp v. Naughten, 414 U.S. 141, 146-47 (1973).

Here, Petitioner is unable to demonstrate that his appellate counsel was ineffective because the argument that the trial court improperly vouched for Long is without merit and thus, is not plainly stronger than the other claims appellate

counsel raised on direct appeal. Long testified at trial that Petitioner was not the shooter. Detective Barilotti testified that he spoke with Long after the shooting and that she had identified Petitioner as the perpetrator of the crime. In the final jury charge, the trial court simply reiterated these facts and instructed the jury to decide for themselves whether the identifications had been reliable and to make their own credibility determinations about the witnesses. This charge did not vouch in any way for the credibility of Long's statement to police over the credibility of her trial testimony. Rather, the court instructed that the jury was to judge for themselves Long's credibility and the reliability of her identification based upon the testimony and evidence presented at trial. Accordingly, the state courts' adjudication of this claim was not contrary to, or an unreasonable application of, clearly established federal law. Petitioner is not entitled to relief on this claim.

    ii.   *Curative Instruction*

Petitioner alleges appellate counsel was ineffective for not arguing that the trial court erred in not providing a curative instruction after Trooper Quinn's testimony regarding Petitioner's guilt. (ECF No. 1-4, at 9-10.) Specifically, Petitioner references the following testimony by Trooper Quinn. (ECF No. 9-13, at 13.) In explaining the circumstances

surrounding Robinson's identification, the following testimony

occurred:

> PROSECUTOR: Can you tell us what happened --
> how did you show the photos, the process?
> And show the ladies and gentlemen of the
> jury how you showed it.
>
> TROOPER QUINN:  Basically, what we'll do is
> put the photos down, show each photo at the
> time, and let the individual pick them.
> Typically -- They were all numbered 1
> through 6.  As we go through, if an
> individual identifies one of the subjects,
> they will take that person (sic.), point at
> it and say "That's him."
>
> In this case, what [Robinson] did -- the
> subject immediately put his finger -- I
> believe he tapped twice, said "That's him
> right there."
>
> PROSECUTOR: Did he say anything after saying
> "That's him?"
>
> TROOPER QUINN: "I have to look at the
> report.  I can't remember specifically, but
> he did say something.
>
> But after going through showing the last two
> photos, he went right back to Photo Number
> 4.  <u>There was no doubt in my mind he had
> chosen the individual who did the shooting.</u>

(ECF No. 9-30, at 68 (emphasis added).)

Petitioner alleges that Trooper Quinn's comment, "[t]here

was no doubt in my mind he had chosen the individual who did the

shooting," required a curative instruction from the court, and

appellate counsel's failure to litigate this issue on appeal

amounted to ineffective assistance of counsel. (ECF No. 1-4, at 9-10.)

After this portion of Trooper Quinn's testimony, defense counsel did inform the trial court about her concerns over the statement made and requested that the trial court provide a curative instruction. (ECF No. 9-31, at 3-4.) The trial court, after reviewing the record, declined to issue such an instruction. (Id. at 5.) The court found that Trooper Quinn had not expressed his opinion as to whether Petitioner was the shooter, but rather that Trooper Quinn was referring to the certainty expressed by Robinson during the photo array that Petitioner was the perpetrator. (Id. at 4-5.)

Petitioner raised this claim of ineffective assistance of counsel during his PCR proceedings. (ECF No. 9-13, at 13.) The PCR court held that Petitioner could not demonstrate ineffective assistance of appellate counsel on this issue because the claim itself was meritless. (ECF No. 9-35, at 19.) The PCR court expressly stated that the trial court's failure to provide a curative instruction did not violate Petitioner's constitutional rights because the testimony had been mischaracterized by the defense. (Id. at 13.) The PCR court found that Trooper Quinn's testimony was rationally based on his own perception and his testimony assisted the jury in determining the credibility of the witness' identification. (Id.) The Appellate Division

summarily affirmed the PCR court's holding, stating "[t]here was no imperative for curative or additional jury instructions under the circumstances presented." See Gould, 2017 WL 4079023, at *4-5.

Here, Petitioner has not shown that this claim was plainly stronger than the other claims raised by appellate counsel on direct appeal. Although Petitioner alleges Trooper Quinn testified as to his certainty of Petitioner's guilt, the record does not support that assertion. Within the context of Trooper Quinn's testimony, it is clear that his statement, "[t]here was no doubt in my mind he had chosen the individual who did the shooting" was referring to Robinson's confidence of his identification of the shooter during the photo array. A curative instruction may be given when it is necessary to mitigate or negate prejudicial evidence. Donnelly v. DeChristoforo, 416 U.S. 637, 644 (1974). However, Petitioner's argument that Trooper Quinn's testimony prejudiced him by providing an opinion as to Petitioner guilt is inaccurate. As the Appellate Divisions held, that claim is a mischaracterization of Trooper Quinn's testimony. Trooper Quinn was not providing an opinion, but rather, remarking upon the confidence Robinson had in identifying the shooter. Therefore, no curative instruction was necessary. Accordingly, the state courts' adjudication of this claim was not contrary to or an

unreasonable application of clearly established federal law.
Petitioner is not entitled to relief on this claim.

iii.  *Prosecutorial Misconduct*

Petitioner also asserts appellate counsel was ineffective
for not arguing that the State had committed prosecutorial
misconduct.  (ECF No. 1-4, at 10-12.)  Petitioner alleges the
following three instances of prosecutorial misconduct were so
egregious that they deprived him of a fair trial.  (ECF No. 1-4,
at 9-12.)

First, at trial, Adams testified as a defense witness and
testified that Petitioner was not the man who shot him.  In an
attempt to attack the credibility of Adams' statement, the
prosecutor elicited testimony from Adams that he was hesitant to
provide information to law enforcement because he did not want
to become known as a "snitch."  (ECF No. 9-31, at 111.)  The
prosecutor then asked Adams whether he had ever heard of a
website called "Stop Camden Snitching."  (Id. at 112.)
Petitioner replied that he was unaware of that website, that he
did not even own a computer.  (Id.)  The prosecutor moved on to
the next question.  (Id.)

Second, the prosecutor also questioned Adams about an
affidavit he wrote stating Petitioner was not the individual who
shot him.  (Id. at 110.)  The prosecutor asked, "Without telling
us where you living, isn't it true that at the time you wrote

27

that affidavit you were living in close proximity to the defendant, Charles Gould?" (Id. (emphasis added).) Adams responded that no, the two men had not been in close proximity. (Id. at 110-11.) The prosecutor later repeated, "And you're denying living in the same exact location as the defendant, Charles Gould, was living when you wrote that affidavit?" (Id. at 118.) Adams responded, "I was living in the Camden County Jail." (Id.) Adams response was stricken from the record.

Finally, during the prosecutor's summation, she attempted to rebut the challenge to Detective Barilotti's investigation as having stemmed solely from "word on the street." (ECF No. 9-32, at 46.) During defense counsel's closing remarks, she stated that the case had been based upon "the word on the street." (ECF No. 9-32, at 21-22.) In response, the prosecutor remarked during summation, in pertinent part:

> And then finally I want to talk to you about the word on the street. The word on the street, [defense] counsel made a lot of it. But, counsel wants you only to think the word on the street goes in one direction and that one direction is from the word to the witnesses, that's the only way she thinks it goes, from the word on the street to taint the witnesses about what they say and who they identify.
>
> I submit to you that it is equally as likely and more likely the word on the street is the other way. If you hear something on the street, the word on the street, are you going to believe it and pass it along if it didn't come from someone who actually

28

witnesses that crime?  Are you going to
repeat the word on the street if it didn't
come from a credible source?

Common sense will tell you it is just as
likely and more likely the word on the
street didn't taint the witnesses, it was
started by these witnesses, that these
witnesses are who started it.  You have not
direct evidence of that, but [defense]
counsel wants you to believe that that is
what tainted them.

It is equally probable reasonable that they
started the word on the street and that's
how it got to the police and then the word
on the street was confirmed by those three
eyewitnesses.

(Id. at 46.)

Petitioner argues that these three instances of alleged
misconduct - the prosecutor's question of Adams whether he had
heard of the website "Stop Camden Snitching," the prosecutor's
inquiry of Adams whether he had been in prison with Petitioner,
and the prosecutor's references during closing remarks to "the
word on the street" – should have been litigated by appellate
counsel on direct appeal.  (ECF No. 9-13, at 10-12.)

Petitioner first raised this claim during his PCR
proceedings.  See Gould, 2017 WL 4079023, at *2.  The Appellate
Division found that "[Petitioner's] claims of prosecutorial
misconduct and unfairness are not objectively borne out by the
record."  Id. at *4.  The Appellate Division held that
Petitioner had received a fair trial and neither the

prosecutor's questions in examining the witnesses, nor the
prosecutor's remarks during summation exceeded "the fair realm
of zealous advocacy." Id. The Appellate Division found that
Petitioner had simply not established that his appellate counsel
had been ineffective. Id. at *4-5.

Here, Petitioner has not shown that these claims of
prosecutorial misconduct are plainly stronger than the other
claims appellate counsel raised on direct appeal. None of the
remarks that Petitioner points to rise to the level of a
constitutional violation. To violate due process, "it is not
enough that the prosecutor's remarks were undesirable or even
universally condemned . . . the prosecutor's comments must "so
infect the trial with unfairness as to make the resulting
conviction a denial of due process." Donnelly, 416 U.S. at 643.
The prosecutor's conduct must be sufficiently prejudicial within
the context of the entire trial. See Werts v. Vaughn, 228 F.3d
178, 198 (3d Cir. 2000) (citing Greer v. Miller, 483 U.S. 756,
766 (1987)).

In the instant case, considering the entire trial record in
context, none of the instances Petitioner references amounted to
prosecutorial misconduct. The prosecutor fairly challenged the
credibility of the Adams' statement that Petitioner was not the
individual who shot him. The prosecutor explicitly did not
attempt to elicit testimony from Adams that he had been in

prison with Petitioner, as evidenced by the fact that prosecutor prefaced her question to Adams, by saying, "Without telling us where you were living, isn't it true that . . ." And, the prosecutor appropriately remarked during summation upon the defense's attack that the investigation into the shooting had been based solely upon "word from the street." Petitioner has not shown that any of these alleged instances of prosecutorial misconduct were plainly stronger claims than the ones raised by appellate counsel on direct appeal. Accordingly, this Court does not find that the state courts' adjudication of this claim was contrary to, or an unreasonable application of, clearly established federal law. Petitioner is not entitled to relief on this claim.

    iv. *Reconstruction of the Record*

Petitioner submits his appellate counsel was also ineffective for "failing to seek a reconstruction of the record concerning vital testimony that was not transcribed due to equipment malfunction." (ECF No. 1-4, at 12-13.) Specifically, Petitioner submits that the testimony of Victoria Long and the discussion between the trial court and defense counsel regarding a jury instruction for Long's testimony were not transcribed. (Id. at 12.) Petitioner alleges that without this crucial information, appellate counsel could not possibly have provided effective assistance. (Id. at 12-13.)

Petitioner raised this claim during his PCR proceedings. (ECF No. 9-13, at 14.)  The PCR court held simply that the claim was "meritless." (ECF No. 9-35, at 19).  The Appellate Division similarly found Petitioner's claim of ineffective assistance of appellate counsel was unavailing and did not warrant comment. See Gould, 2017 WL 4079023, at *5.

This Court agrees with the Appellate Division's holding and finds that Petitioner's argument is not borne out by the record. On the second day of the trial, May 5, 2011, Trooper Quinn testified in the morning. (ECF No. 9-30.)  During Trooper Quinn's testimony about witness Kelly Robinson's identification of Petitioner from a photo array, the transcript states the following:

> (Whereupon, as a result of a malfunction with the Court Reporter's steno machine which required immediate attention, the remainder of the morning session was tape recorded.  Those proceedings included the remainder of this witness' testimony, the testimony of Victoria Long, and the testimony of Arthur Barilotti.)

(Id. at 72-73.)

As indicated in the above transcript, the remainder of that morning's proceedings were tape recorded. (ECF No. 9-29.)  The tape-recorded proceedings, which were later transcribed, included the remained of Trooper Quinn's testimony, the entirety of Victoria Long's testimony, and the subsequent Gross hearing

that was conducted.  (Id.)  At the end of that recording, the court indicates that the court reporter's machine has been repaired and the afternoon proceedings that day will be transcribed again by the court reporter.  (Id. at 27.)

Accordingly, Petitioner's argument that Long's testimony was not recorded and that appellate counsel should have sought a "reconstruction of the record" is completely without merit since Long's entire testimony was tape recorded and appellate counsel had the complete trial record.  Thus, this claim is not plainly stronger than the other claims raised by appellate counsel on direct appeal.  The state court's determination of this claim was not contrary to, or an unreasonable application of, clearly established federal law.  Petitioner is not entitled to relief on this claim.

**IV.   CERTIFICATE OF APPEALABILITY**

The AEDPA provides that an appeal may not be taken to the court of appeals from a final order in a § 2254 proceeding unless a judge issues a certificate of appealability on the ground that "the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  This Court will deny a certificate of appealability because jurists of reason would not find it debatable that dismissal of the Petition is correct.

## V.   CONCLUSION

For the above reasons, the § 2254 habeas petition will be denied, and a certificate of appealability will not issue.  An appropriate Order follows.


Dated: September 30, 2019            s/ Noel L. Hillman
At Camden, New Jersey         NOEL L. HILLMAN, U.S.D.J.